AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   8:23-MJ-00472 |
| Premises located on parcel number 3062-014-008 in Llano, California | ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Manufacturing, distribution, and possession with intent to distribute controlled substance |
| 21 U.S.C. § 841(c)(1) | Possession of listed chemical with intent to illegally manufacture controlled substance |
| 21 U.S.C. § 846 | Conspiracy and attempt to distribute controlled substances |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

/s/ Zachary Bargeron
_____
*Applicant's signature*

Zachary Bargeron, Special Agent, DEA
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Santa Ana, CA</u>

HON. JOHN D. EARLY, U.S. MAGISTRATE JUDGE
_____
*Printed name and title*

AUSA: Jennifer L. Waier  x-3550

## AFFIDAVIT

I, Zachary Bargeron, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of an application for warrants to search:

a.    The premises located on parcel number 3062-014-008 in Llano, CA, as described further in Attachment A-1 (the **"SUBJECT PREMISES"**); and

b.    A 2001 Jeep Cherokee bearing California license plate number 7SDE016, as described further in Attachment A-2 (the **"SUBJECT VEHICLE"**).

2.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (manufacturing, distribution, and possession with intent to distribute controlled substances), 841(c)(1) (possession of a listed chemical with intent to illegally manufacture a controlled substance), and 846 (conspiracy and attempt to distribute controlled substances) (collectively, the "SUBJECT OFFENSES"), as described more fully in Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants and does not purport to set forth all my knowledge of or investigation into

this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

## II.  <u>BACKGROUND OF AFFIANT</u>

4.    I am an investigative and law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct investigations of, and make arrests for, the offenses enumerated in Title 18, United States Code, Section 2516.  I am a Special Agent ("SA") of the Drug Enforcement Administration ("DEA"), an agency of the U.S. Department of Justice.  I have been so employed since December 2019.  I am currently assigned to the Los Angeles Field Division ("LAFD") Orange County District Office ("OCDO").  At the OCDO, I am assigned to Enforcement Group-1 ("ENF-1"), an enforcement group investigating narcotics trafficking and money laundering violations under Titles 18 and 21 of the United States Code.  I have received 17 weeks of specialized training in Quantico, Virginia, pertaining to narcotics trafficking, money laundering, undercover operations, and electronic and physical surveillance procedures.

5.    During my employment, I have received comprehensive, formal instruction on such topics as drug identification, money laundering techniques, patterns of drug trafficking, complex conspiracies, the exploitation of narcotics traffickers' telecommunications devices, criminal law, surveillance, and other investigative techniques.  I have initiated and assisted in investigations into the unlawful importation, manufacture,

possession with intent to distribute, and distribution of narcotics (including cocaine, heroin, and methamphetamine), the laundering of narcotics proceeds, and conspiracies associated with narcotics offenses.  In conducting these investigations, I have utilized a variety of investigative techniques and resources, including but not limited to techniques such as surveillance, confidential sources, pen registers, search warrants, telephone toll analysis, vehicle trackers, and T-III intercepts.

6.   I know from my training and experience that narcotics traffickers frequently use telephones, including cellular telephones, to arrange transportation and deliveries of narcotics and to coordinate the sale of narcotics.  Narcotics traffickers frequently use coded language when referring in telephone conversations to illegal narcotics, precursor chemicals, or proceeds obtained from the sale of narcotics.

7.   I know that narcotics traffickers are aware that law enforcement monitors telephones to identify illegal activity.  For that reason, narcotics traffickers frequently use false names or family and/or friends' names when obtaining cellular telephones to avoid detection by law enforcement.

8.   I am currently one of the agents assigned to an investigation of narcotics trafficking occurring in the Southern California area.  As shown and discussed in more detail below, narcotics traffickers in the Southern California area are supplying methamphetamine and other controlled substances for distribution to various parts of the United States.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

9.   As detailed below, the LIZARRAGA-SANCHEZ Drug Trafficking Organization ("DTO") is connected to a drug trafficking conspiracy that, among other things, operates laboratories in Southern California, which convert liquid methamphetamine to crystal methamphetamine.  The **SUBJECT PREMISES** is an isolated parcel located in Llano, California, and as detailed below, likely contains a methamphetamine conversion laboratory.

10.   In November 2022, U.S. Customs and Border Protection ("CBP") Officers assigned to the San Ysidro Port of Entry ("POE") apprehended Kahdafi Dumarea MCGRAW, Remy Fernando SORIA ("SORIA"), and Brian Adam VIDAURY ("VIDAURY") attempting to smuggle approximately 251.62 kilograms of liquid methamphetamine concealed within the fuel tanks of an RV towed by a Ford Excursion XLT bearing California license plate 8TBE837 (the "Excursion"). Inside the Excursion, Homeland Security Investigations ("HSI") SAs later located a receipt from Liberty Battery Inc & Auto Electric. The receipt indicated Jesus LIZARRAGA-SANCHEZ ("LIZARRAGA-SANCHEZ") brought the Excursion to Liberty Battery Inc & Auto Electric for electrical wiring to a trailer.  The receipt contained the Excursion license plate 8TBE837, LIZARRAGA-SANCHEZ's phone number, and the address of his family's residence located at 3724 E. 53rd St., Maywood, CA.

11.   On July 17, 2023, members of DEA OCDO ENF-1 conducted surveillance of a silver Honda Accord bearing California license plate 9GWF616, registered to Jessica CARACHURE, a facilitator for the LIZARRAGA-SANCHEZ DTO believed to register vehicles and

cellular devices in her name on behalf of the DTO.  Investigators followed the Honda Accord from Bellflower, CA, to the **SUBJECT PREMISES.**

12.  Based on aerial images obtained in July and August 2023, the **SUBJECT PREMISES** appears to contain structures used as a methamphetamine lab and other structures used to further methamphetamine production.  The largest structure, the primary "southeast structure," has solar panels and does not have grid-tied electricity.  Two additional structures were added to the primary structure, which, as described below, are indicative of methamphetamine conversion.  The southeast structure appears to be a covered shed with solar panels and wires running into the primary southeastern structure, as well as a broken washer which, as described below, is often the result of methamphetamine conversion.  There is also a second structure (the "northeast structure"), which had suspected crystal methamphetamine drying in large circular piles on a tarp, multiple discarded 50-gallon drums, and other waste that often accumulates from the methamphetamine crystallization process.

a.  Based on my training and experience, including conversations with other investigators, indicia of methamphetamine production and trafficking found at methamphetamine labs includes: blue 50 gallon drums and black 50 gallon drums typically used to store liquid methamphetamine, various styles of plastic-insulated ice chests, buckets, fridges, deep freezers, and pots and pans used in the process to produce methamphetamine, and/or chemicals such as muriatic acid and acetone.

b.   Based on my training and experience, including conversations with other investigators, liquid methamphetamine is commonly concealed in diesel gasoline and muriatic acid is used to separate both compounds.  Methamphetamine producers often boil the liquid methamphetamine solution to further remove any remaining diesel gasoline.  Once the liquid methamphetamine is separated, the substance is placed in coolers, fridges, and/or deep freezers and solidified and crystallized into large shards.  Once crystallized, the methamphetamine often has a brown tint due to the remanence of diesel gasoline.  To remove the discoloration and make the methamphetamine more presentable and saleable, acetone is used to bleach the methamphetamine.  After the methamphetamine has been bleached several times with acetone, it goes through a drying process, which consists of using fans inside a room or sometimes being left outside to dry.  Commonly, tarps are seen outside to conceal the drying process from aerial view.  Once the methamphetamine is dried, it is generally packaged and ready for shipment.

### IV.   <u>STATEMENT OF PROBABLE CAUSE</u>

**A.   July 17, 2023, Surveillance and Identification of the SUBJECT PREMISES**

13.   On July 17, 2023, members of DEA OCDO ENF-1 conducted surveillance at 15704 Orange Ave., Paramount, CA, the suspected residence of Jessica CARACHURE, a LIZARRAGA-SANCHEZ DTO facilitator believed to register vehicles and cellular devices in her name for the DTO.

14.   Task Force Officer ("TFO") Trent Chandler saw CARACHURE exit the apartment complex driving a Range Rover bearing

California license plate 7GDD216.  A law enforcement database query showed the registered owner of the Range Rover as Jessica CARACHURE at 15704 Orange Ave. Apt. 143, Paramount, CA 90723.

15.  TFO Chandler saw CARACHURE park along the curb in the vicinity of 9334 and 9326 Somerset Blvd., Bellflower, CA. Investigators watched CARACHURE exit the Range Rover and enter the Somerset Garden Apartments located at 9308 Somerset Blvd., Bellflower, CA.  I observed CARACHURE use her keys to open a mailbox located on the right wall of the apartment complex.  Group Supervisor ("GS") Ryan Gossen then watched CARACHURE walk up the stairs to the second floor of the complex and go into apartment 26.

16.  GS Gossen observed a grey Honda Accord bearing California license plate 9GWF616 parked in parking space 26.  A law enforcement database query showed the registered owner of the Honda Accord as Jessica CARACHURE, 15704 Orange Ave. Apt. 143, Paramount, CA 90723.

17.  A short time later, TFO Chandler watched the Honda Accord depart Somerset Garden Apartments occupied by three unknown Hispanic males ("UMs").

18.  Investigators surveilled the Honda to Ross Dress for Less located at 12130 Lakewood Blvd., Downey, CA.  I watched the three UMs get out of the Honda Accord and enter Ross Dress for Less.

19.  Approximately 25 minutes later, TFO Chandler observed the UMs exit Ross Dress for Less and enter the Honda Accord.  I observed one UM carrying a large white Ross Dress for Less bag.

20.  At approximately 11:40 a.m., TFO Chandler observed the Honda Accord leave the area.  While surveilling the Honda Accord, TFO Chandler noted the wheels of the vehicle were covered in brown dirt and the body of the car also had a thin layer of dirt on it. Based on the observations, investigators suspected the Honda Accord had recently traveled on a non-paved road.

21.  Investigators followed the Honda to Llano, CA.  TFO Chandler watched the Honda Accord make a southbound turn onto Largo Vista Rd., Llano, CA.  Shortly after, TFO Bryan Cramer saw the Honda Accord make a westbound turn onto Pretty-O-Ranch Road, which is a non-paved dirt road.  Investigators noted the last direction of travel and, due to the remote location, requested the assistance of DEA Los Angeles Field Division ("LAFD") Airwing in locating the Honda Accord.

a.  Based on my training and experience, I know DTOs use this region to house liquid methamphetamine conversion laboratories.  The hot and dry climate dries the liquid methamphetamine, and the secluded nature of the structures prevents overt detection by law enforcement or citizens.  I know the LIZARRAGA-SANCHEZ DTO transports liquid methamphetamine from Mexico to various DTO-operated laboratories in Southern California to convert the liquid into crystal methamphetamine.

22.   As pictured below, DEA Airwing found the Honda Accord parked at the **SUBJECT PREMISES.**   DEA Airwing saw a red sedan, believed to be a Toyota, also parked on the property.   DEA Airwing watched several unknown males travel between the vehicles and the structure.





    23.  DEA Airwing later provided investigators with video footage of the flight over the parcel and structure.  The structure appears to be a mobile home with several additions.  The windows of the structure are boarded up with small ventilation slits.  Several solar panels are located on the structure.  A large white item that appears to be a washing machine is located outside of the residence.

    24.  At approximately 2:47 p.m., TFO Cramer drove northbound on 200th Street and confirmed the Honda Accord parked at the **SUBJECT PREMISES** bore California license plate 9GWF616.

      a.  Based on my training, experience, and knowledge of this investigation, I believe the three UMs purchased clothing at Ross Dress for Less before driving to the **SUBJECT PREMISES,** which the UMs planned to wear before or after working at the **SUBJECT PREMISES** to avoid contamination of the Honda Accord and/or to act as personal protective equipment.

25.   On July 18, 2023, TFO Chandler used a law enforcement license plate reader database to determine when the Honda Accord left the **SUBJECT PREMISES**.   TFO Chandler learned the Honda Accord was identified traveling south on Beach Blvd. in Stanton, CA, at approximately 9:39 p.m., and traveling north on Beach Blvd. in Stanton, CA, at approximately 11:23 p.m.

26.   Based off the data TFO Chandler obtained, I observed via pole camera the Honda Accord arrive and park in the driveway of 11561 Santa Cruz St., Stanton, CA.   I saw three UMs exit the Honda Accord and enter the residence.   At approximately 11:15 p.m., I saw the Honda Accord at 11561 Santa Cruz St., Stanton, CA.   The individuals who live at the residence are suspected members of the DTO who use the property as a narcotics stash location.

27.   On July 18, 2023, using the Los Angeles County Assessor Portal, TFO Chandler located the **SUBJECT PREMISES,** to which the three UMs drove the Honda Accord.   The Assessor Identification Number ("AIN") is 3062-014-008.   TFO Chandler contacted the Lancaster Office Assessor's Responsible Division, which advised the parcel was purchased in 2019 and there are no permits for structures on the parcel.

**B.   Information Gathered from GPS Tracking Device on Honda Accord**

28.   On July 24, 2023, the Honorable Karen E. Scott, United States Magistrate Judge, Central District of California, issued a warrant (8:23-MJ-00373) authorizing the use of a GPS vehicle tracker on the silver 2017 Honda Accord bearing California license plate 9GWF616, registered to Jessica CARACHURE, 15704 Orange Ave., Apt. 143, Paramount, CA.

11

29.  On July 31, 2023, investigators surveilled the Honda Accord to the Citadel Outlets located at 100 Citadel Rd., Commerce, CA.  At approximately 3:53 p.m., I installed the GPS tracking device on the Honda Accord bearing California license plate 9GWF616.

30.  I reviewed the GPS tracking device data from July 31, 2023, through August 31, 2023, and learned the Honda Accord visited the **SUBJECT PREMISES** on August 3, 7, 12, and 22.  On August 3, 2023, the Honda Accord traveled to the **SUBJECT PREMISES** and then traveled approximately 33 miles to 10550 Colusa Rd., Adelanto, CA, where it stayed for approximately 1 minute before departing.  Through open source databases, I learned 10550 Colusa Rd., is a large, secluded, fenced property with multiple structures, RVs, and semitrucks on the property.

     a.  Based on my training and experience, I know liquid methamphetamine is commonly concealed in spare diesel gas tanks on semitrucks and RVs.

31.  On August 7, 2023, the Honda again visited the **SUBJECT PREMISES** and then traveled to the Adelanto residence where it remained for approximately 5 minutes before departing.

     a.  Based on my training, experience, and knowledge of this case, I know the LIZARRAGA-SANCHEZ DTO uses various methods to transport liquid methamphetamine from Mexico to conversion labs throughout California.  I know once the liquid methamphetamine is converted into crystal methamphetamine, the finished product is retrieved by DTO couriers and dispersed to various stash locations in the Southern California area.  Due to the duration of each trip to Adelanto, I believe the Honda retrieved finished crystal

methamphetamine from another methamphetamine lab to transport it to stash locations in Southern California.

32.   On August 12, 2023, I observed the Honda travelled to the **SUBJECT PREMISES** for approximately 16 minutes before traveling to the area of 1313 Ridgeview St., Bakersfield, CA, the suspected residence of Juan Daniel CASTRO-PERAZA, a known courier within the LIZARRAGA-SANCHEZ DTO.[1]

a.   Based on my training, experience, and knowledge of this case, I know the DTO has members residing in the Bakersfield, CA area.  For these DTO members in the Bakersfield area to receive narcotics, couriers from the Southern California area must drive the drugs north.  Based on the brief stop at the **SUBJECT PREMISES** before driving to Bakersfield, I believe the unknown occupants of the Honda retrieved narcotics from the **SUBJECT PREMISES** to resupply the DTO members in the Bakersfield area.

C.   **DEA Airwing Flyovers**

33.   As described above, during the July 17, 2023, surveillance, investigators used DEA Airwing to assist in identifying the **SUBJECT PREMISES.**

34.   On July 28, 2023, investigators requested DEA Airwing to conduct a reconnaissance flyover to gather additional photographs of the **SUBJECT PREMISES.**  I reviewed the pictures from the flyover, embedded below, and observed the following:

a.   A silver pickup truck towing a large trailer was parked outside the primary southeastern structure.  The trailer

---

[1] On February 7, 2023, Downey Police Department detectives arrested CASTRO-PERAZA after CASTRO-PERAZA transported approximately 14.43 kilograms of suspected methamphetamine for sale to a DEA confidential source.

carried a large rectangular shaped object.  The truck bed
contained what appeared to be various coolers, wood, and other
unknown objects.

       b.   A silver Jeep Cherokee was parked next to the
silver pickup truck.



**D.    Irvine Police Department Drone Flyover of SUBJECT PREMISES on
August 17, 2023.**

     35.  At my request, on August 17, 2023, Irvine Police
Department ("IPD") Officers Shawn Miller and Dylan Stalker used
various drones to conduct flyovers and record the **SUBJECT
PREMISES.**

     36.  Based on my review of the recording, I learned the
following:

a.    The **SUBJECT VEHICLE** bearing California license plate 7SDE016 was parked outside the primary southeastern structure.  Using law enforcement databases, I learned the **SUBJCET VEHICLE** is registered to Latrey DUMAS ("DUMAS") at 1962 E. 114th St., Los Angeles, CA.  I further learned the **SUBJECT VEHICLE** registration expired on January 2, 2022.

b.    Through law enforcement databases, I further discovered that as of May 2023, DUMAS is associated to an address in San Antonio, TX.  I learned from approximately November 2021 to July 2022, DUMAS was associated to 11210 Towne Ave., Los Angeles, CA.  Based on my knowledge of this case, I know SORIA and VIDAURY were associated to the 11210 Towne Ave. residence during the same time as DUMAS.  I know relatives and associates of SORIA and VIDAURY are still associated to the Towne Ave. residence.

c.    Based on my training, experience, and knowledge of this case, I believe when DUMAS moved from California to Texas, DUMAS left the **SUBJECT VEHICLE** to SORIA and VIDAURY at the 11210 Towne Ave. residence.  When SORIA and VADAURY were arrested in November 2022, I believe an associate at the Towne residence took possession of the **SUBJECT VEHICLE** and continued working for the LIZARRAGA-SANCHEZ DTO.  I believe the current driver of the **SUBJECT VEHICLE** is the primarily facilitator of methamphetamine conversion at the **SUBJECT PREMISES**.

**E.    IPD Drone Flyover on August 24, 2023, Confirms SUBJECT PREMISES Is Methamphetamine Conversion Lab.**

37.  At my request, on August 24, 2023, IPD Detectives William Hillyard and Nicholas Johnson used various drones to conduct flyovers and record the **SUBJECT PREMISES**.

38.   Based on my review of the recording and as demonstrated below, I observed the following:

a.   The **SUBJECT VEHICLE** bearing California license plate 7SDE016 was parked outside the primary southeastern structure.

b.   The **SUBJECT PREMISES** is an approximately 106,590 square foot parcel that contains a fenced off area, which includes three structures, including the primary structure located in the southeastern corner of the property, a smaller structure located in the southeast corner of the property, and a structure on the northeast.  The property also contains a large metal gate on the west side of the property.  I further examined the gate and the fence surrounding the property, depicted below.  I noted the surrounding fence is a dilapidated chain link fence, while the primary gate to the property appears to be steel or metal between two large concrete pillars.  I believe the DTO constructed this style of gate to keep out people not associated with the DTO.  As previously mentioned, the structures on the parcel are not permitted on the parcel.



     c.   Below is an aerial photograph of the southern portion of the **SUBJECT PREMISES,** with labels indicating the primary structure located in the southeastern corner of the property, a smaller structure located in the southeast corner of the property, and a structure on the northeast side of the property.

     d.   The primary southeast structure appears to be a brownish red double wide trailer with a brown shingle roof with solar panels on top.  The trailer has a white door located on the north side.  The trailer has barred windows on both the east and west sides of the trailer.



e.   The primary southeast structure has two additional structures built off the trailer.

i.   The additional structure on the northside of the trailer appears to be detached from the trailer and has a clear white roof and white outer walls with a white door on the north wall.  The structure has black mesh material surrounding the structure, connected to the roof, and anchored on the wall.  Under the clear white roof, I saw a white/grey tarp that appeared to hang from the roof to the floor.  The structure has no windows and is completely concealed by the tarp and black mesh.  I believe the white tarp and black mesh conceal items within the structure.  I observed a wooden fence surrounding the structure with a walkway leading from the white door to the northeast structure. Additionally, I observed what appeared to be a 275-gallon water tank in the northeast corner and a 275-gallon water tank with

steel pallets against the outer wall.  The water tank against the structure appears to have a black tube running from the top of water tank into the structure.  I further observed a burn pit north of the structure and scattered buckets.  Based on my observation of the additional structure on the north side of the trailer, I believe the DTO uses the primary trailer to separate and convert the liquid methamphetamine into crystal methamphetamine and moves the finished product into the tarped structure where it begins the drying phase.

       ii.  The second additional structure built on the south side of the trailer appears to be makeshift structure with a blue and brown metal roof.  The structure has a white door on the east side, an opening without a door on the west and a window located on the south.



iii. As I examined the smaller southeast shed-style structure, I saw multiple solar panels with wires running into the primary double wide trailer.  To the southwest of the structure, I saw an apparently inoperable washing machine and, to the south, a 275-gallon water tank with steel pallets.



f.    Based on my training and experience, including speaking with other investigators, methamphetamine labs bleach crystal methamphetamine with acetone by mixing the substances together in buckets, washing machines, and various tubs.

g.    Besides the solar panels on the southeast structure, there appeared to be no source of electricity in the other structures located on the property.

h.    As shown below, I saw 50-gallon blue barrels along the east fence line within a black metal cage.  I saw additional 50-gallon blue barrel tops scattered along the east fence line.



     i.   The northeast structure appears to be composed of wooden boards with a silver metal roof.  Under the metal roof, I observed a white and blue striped sheet further covering the top of the structure.  On the northside of the structure, I saw a torn white and blue stripped sheet covering portions of the top half of the structure.  Below the white and blue stripped sheet, I observed a green tarp covering the bottom half of the structure.  The green tarp had a large square cut out on the bottom right side revealing the inside of the structure.  Through the opening, I saw multiple large circular piles of a white, shiny, crystal-like substance, consistent with crystal methamphetamine.  Based on my observation of the piles, I believe the crystal methamphetamine was previously in 50-gallon barrels while being mixed with acetone

to bleach the methamphetamine.  Once the methamphetamine was bleached white, the buckets were then tipped over onto the tarp to form circular piles for the methamphetamine to dry.



j.   As seen in the photos below, I observed a white box with unknown writing on the side.  Based on a search of acetone boxes and packaging, I believe the box seen in the structure is consistent with acetone boxes.  I further observed numerous white and blue 50-gallon barrels inside the structure.  Based on my training and experience, I know these types of barrels are often used to store chemicals and liquid methamphetamine and to bleach the crystal methamphetamine with acetone.





k.   As shown below, I noted a blue 50-gallon barrel on its side with what appeared to be wet ground at the top opening.

The barrel was in the vicinity of the white, shiny, crystal-like piles, indicating the barrel was used to form the circular piles.



### F.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

39.   As described above, processing liquid methamphetamine requires several steps.  Consequently, I know DTOs commonly use available storage locations, including motorhomes, structures, and vehicles, to store liquid methamphetamine, precursors, chemicals, indicia, and crystallized methamphetamine.  Through my training and experience, I know converting methamphetamine is inherently dangerous, as many of the chemicals are highly flammable. Therefore, DTOs use multiple structures for the methamphetamine production, as well as using multiple structures and vehicles to store narcotics proceeds and materials and equipment used in making narcotics and to house individuals working for the DTO.

40.   Based on other methamphetamine conversion laboratories with which I am familiar and speaking with other investigators, I suspect that the **SUBJECT PREMISES** is a methamphetamine laboratory because of, among other things, the following:

a.   The circular piles of a white, shiny, crystal-like substance consistent with methamphetamine;

b.   its remote location;

c.   the lack of connection to the electrical grid;

d.   the broken washing machine; and

e.   the discarded barrels, buckets, water tanks, and other waste that, based on my training and experience, often accumulate from the methamphetamine crystallization process.

41.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers who control and/or operate clandestine drug laboratories are often armed and such individuals often keep multiple firearms in and around the laboratories to protect the laboratory equipment and illegal drugs, both of which are valuable.

c.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs and precursor materials used to manufacture drugs. The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences and businesses.

d.   Communications between people buying and selling drugs and drug precursors take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

e.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

f.   Drug traffickers often use vehicles to transport their drugs and drug precursor materials and may keep stashes of

drugs in their vehicles in the event an unexpected opportunity to sell drugs arises.

g.   Drug traffickers often maintain on hand large amounts of United States currency to finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

h.   Drug traffickers often keep drugs and drug precursor materials in places where they have ready access and control, such as at their businesses, residences, or in safes.  They also often keep other items related to their drug trafficking activities at their residence and businesses, such as digital scales, packaging materials, materials used to manufacture drugs, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

i.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## V.   <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]</u>

42.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, *inter alia*, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are not
kept in places where the user stores files, and in places where
the user may be unaware of them.  For example, recoverable data
can include evidence of deleted or edited files; recently used
tasks and processes; online nicknames and passwords in the form of
configuration data stored by browser, e-mail, and chat programs;
attachment of other devices; times the device was in use; and file
creation dates and sequence.

      c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and who
used it.  For example, showing the absence of certain software on
a device may be necessary to rebut a claim that the device was
being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain "booby
traps" that destroy or alter data if certain procedures are not
scrupulously followed.  Law enforcement continuously develops and
acquires new methods of decryption, even for devices or data that
cannot currently be decrypted.

43.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons, including
the following:

      a.   Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,

often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so many
types of digital devices and programs that it is difficult to
bring to a search site all the specialized manuals, equipment, and
personnel that may be required.

   e. Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

  44. The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of publicly
available materials:

   a. Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or eye,
and the device will automatically unlock if that physical feature
matches one the user has stored on the device.  To unlock a device
enabled with a fingerprint unlock function, a user places one or
more of the user's fingers on a device's fingerprint scanner for
approximately one second.  To unlock a device enabled with a
facial, retina, or iris recognition function, the user holds the
device in front of the user's face with the user's eyes open for
approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   As set forth above, the **SUBJECT PREMISES** is likely a methamphetamine conversion lab used by multiple members of a DTO to produce and transport methamphetamine.  I know, based on my training and experience, that, to protect valuable drugs, drug traffickers do not permit those who are uninvolved in the DTO's drug business to be at the methamphetamine conversion lab.  In my training and experience, digital devices found at methamphetamine conversion labs like the **SUBJECT PREMISES** may not have a clearly identifiable user based on the exterior of the device and/or may have multiple users whose biometric features may unlock the devices because drug traffickers share digital devices on which to coordinate drug trafficking and the laundering of drug trafficking proceeds.  Thus, if while executing the warrant, law enforcement personnel encounter a digital device within the scope of the warrant that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to every person who is located at the **SUBJECT PREMISES** during the execution of the search who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of the

31

warrant: (1) depress the person's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of the face of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

45.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI.  REQUEST FOR NIGHT SERVICE

46.  Based on my training, experience, and discussions with other law enforcement officers, including DEA Special Response Teams ("SRTs"), I know the following:

a.  Methamphetamine laboratories are inherently dangerous and SRT teams commonly encounter armed subjects related to such properties.

b.  The area in and around Llano, CA, is known for illegal cannabis grows, methamphetamine laboratories, and other illegal activity.  DEA SRTs have executed several warrants on properties near the **SUBJECT PREMISES**.  During the execution of these warrants, DEA SRTs have encountered armed subjects related to other methamphetamine laboratories and cannabis-style grows, as it is common for subjects to keep their properties secure from rival(s) and/or person(s) they might encounter.  Law enforcement officers have seized various types of weapons from these properties, including, but not limited to, knives, handguns, shotguns, AK-47s, and assault rifles.

47.  Due to the **SUBJECT PREMISES** being in a remote area, with several structures, and the inability to conduct mobile surveillance of the property, I am unable to confirm whether

multiple person(s) reside there.  Members of DEA SRT who will execute the search warrant have expressed to me the unique challenges of safely approaching the **SUBJECT PREMISES** during the day, as there are no other structures within the area to provide concealment or cover from the property.  Based on the inherent danger and remoteness of the **SUBJECT PREMISES,** I am requesting night service to use the cover of darkness to safely execute the warrant.

### VI.  <u>CONCLUSION</u>

48.  For the reasons above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSES, will be found on or in the vicinity of the **SUBJECT PREMISES** and the **SUBJECT VEHICLE,** as described in Attachments A-1 and A-2, respectively.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ____ day of
September 2023.

_____
THE HONORABLE JOHN D. EARLY
UNITED STATES MAGISTRATE JUDGE

33

## <u>ATTACHMENT A-1</u>

<u>**PREMISES TO BE SEARCHED**</u>

The premises located on parcel number 3062-014-008 in Llano, CA (the "**SUBJECT PREMISES**").  The **SUBJECT PREMISES** is an approximately 106,590 square foot parcel that includes three structures and various cars.  The primary structure, the "southeast structure," located on the southeast portion of the parcel, is a brownish red, double wide trailer, with a brown shingle roof with solar panels mounted on the roof.  The northern additional structure built off the trailer has a clear white roof and white outer walls with black mesh.  Under the clear roof the structure contains a large tarp.  The southern additional structure built off the trailer is a makeshift structure with a blue and brown metal roof.  The second structure, the "southeast structure," is a shed-like structure with multiple solar panels mounted to the roof.  The third structure, the "northeast structure," appears composed of wooden boards with a silver metal roof.  Under the metal roof is a white and blue striped sheet, which further covers the top of the structure.

Below is a picture of the location of the **SUBJECT PREMISES** from the Los Angeles County Assessor-Recorder-County:



 

    The **SUBJECT PREMISES** to be searched includes all rooms, sheds, garages, carports, storage spaces, vehicles parked on premises, or other structures located on the **SUBJECT PREMISES**. The **SUBJECT PREMISES** to be searched also includes any individual(s) found on said premises at the time of the search warrant's execution.

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

1. The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (manufacturing, distribution, and possession with intent to distribute controlled substances), 841(c)(1) (possession of a listed chemical with intent to illegally manufacture a controlled substance), and 846 (conspiracy and attempt to distribute controlled substances) (collectively, the "SUBJECT OFFENSES"), namely:

a. Any controlled substance, controlled substance analogue, listed chemical, controlled substance residue, precursor chemical used in the manufacture of controlled substances, as well as any manufacturing, cutting, and/or diluting agents used in the manufacture of controlled substances;

b. Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c. Any and all laboratory equipment including but not limited to glassware, hoses, pots, clamps, tubes, buckets, trash cans, stirring sticks or rods, strainers, chemical containers, personal protective equipment and clothing, and handwritten or printed chemical formulas, books, and papers containing chemical formulas for controlled substances;

i

d.   Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

e.   United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

f.   Any firearms, ammunition, and firearm accessories;

g.   Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

h.    Records, documents, programs, applications and
materials, or evidence of the absence of same, sufficient to
show call log information, including all telephone numbers
dialed from any of the digital devices and all telephone numbers
accessed through any push-to-talk functions, as well as all
received or missed incoming calls;

i.    Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show SMS text, email communications or other text or written
communications sent to or received from any of the digital
devices and which relate to the above-named violations;

j.    Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show instant and social media messages (such as Facebook,
Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp),
SMS text, email communications, or other text or written
communications sent to or received from any digital device and
which relate to the above-named violations;

k.    Audio recordings, pictures, video recordings, or
still captured images related to the purchase, sale,
transportation, or distribution of drugs;

l.    Contents of any calendar or date book;

m.    Global Positioning System ("GPS") coordinates and
other information or records identifying travel routes,
destinations, origination points, and other locations; and

n.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the SUBJECT OFFENSES, and forensic copies thereof.

o.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and

iv

manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

        viii.    records of or information about
Internet Protocol addresses used by the device;

        ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

3.  As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to

store digital data (excluding analog tapes such as VHS); and
security devices.

**<u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>**

4.    In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.    Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) and/or forensic image(s) thereof
to an appropriate law enforcement laboratory or similar facility
to be searched at that location.  The search team shall complete
the search as soon as is practicable but not to exceed 120 days
from the date of execution of the warrant.  The government will
not search the digital device(s) and/or forensic image(s) thereof
beyond this 120-day period without obtaining an extension of time
order from the Court.

b.    The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

i.    The search team may subject all of the data
contained in each digital device capable of containing any of the
items to be seized to the search protocols to determine whether
the device and any data thereon falls within the scope of items to
be seized.  The search team may also search for and attempt to
recover deleted, "hidden," or encrypted data to determine,

pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.    The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.    If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the

vii

other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.    During the execution of this search warrant, with respect to any person who is located at the **SUBJECT PREMISES** during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of the warrant, law

viii

enforcement personnel are authorized to: (1) depress the thumb-
and/or fingerprints of the person onto the fingerprint sensor of
the device (only when the device has such a sensor), and direct
which specific finger(s) and/or thumb(s) shall be depressed; and
(2) hold the device in front of the face of the person with his
or her eyes open to activate the facial-, iris-, or retina-
recognition feature, in order to gain access to the contents of
any such device.  In depressing a person's thumb or finger onto
a device and in holding a device in front of a person's face,
law enforcement may not use excessive force, as defined in
Graham v. Connor, 490 U.S. 386 (1989); specifically, law
enforcement may use no more than objectively reasonable force in
light of the facts and circumstances confronting them.

     7.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.